NOT DESIGNATED FOR PUBLICATION

No. 126,710

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CALLY BUEHNE,
*Appellant*,

v.

KANSAS DEPARTMENT FOR CHILDREN AND FAMILIES,
*Appellee*.

MEMORANDUM OPINION

Appeal from Ford District Court; LAURA H. LEWIS, judge. Submitted without oral argument. Opinion filed March 20, 2026. Affirmed.

*Peter J. Antosh*, of Garcia & Antosh, LLP, of Dodge City, for appellant.

No appearance by appellee.

Before HURST, P.J., ATCHESON and ISHERWOOD, JJ.

ISHERWOOD, J.: Cally Buehne received food assistance through the Kansas Department for Children and Families (DCF) for several years before a fraud investigation called her eligibility into question and disqualified her from the receipt of further benefits. The results of that probe ultimately prompted an administrative law judge (ALJ) to conclude that Buehne intentionally and repeatedly failed to disclose her ownership of four properties to DCF, and those properties put Buehne above the maximum allowable nonexempt resource limit for her household. The ALJ determined that Buehne's conduct was fraudulent and ordered her to repay $13,739 in overpaid benefits. On appeal, the district court affirmed the ALJ's findings.

1

Buehne now appeals the determination to our court, on the grounds that there was not sufficient evidence to support the agency's findings. Buehne bore the burden at the administrative hearing to provide evidence that contradicted DCF's claims, and she failed to do so. As a result, the ALJ was foreclosed from conducting the analyses Buehne claims would have proven that she legitimately qualified for the assistance she received.

After careful consideration of Buehne's arguments and the record on appeal, we are satisfied the appropriate conclusion was reached in this matter. There is substantial evidence to support a finding that Buehne engaged in fraudulent conduct given that DCF demonstrated Buehne intentionally, and in violation of the food assistance program regulations, withheld information about the properties from it in an effort to avoid a calculation of household resources that rendered her ineligible for food assistance benefits. The agency's judgment and order directing Buehne to repay $13,739 of overpaid benefits is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

Cally Buehne began receiving food assistance from DCF in 2013 and submitted annual review forms to the agency through 2016 to maintain her eligibility for the program. In 2017, DCF closed her food assistance case because she failed to provide or verify information requested by the agency. Buehne reapplied for the program in 2018 and DCF renewed her food assistance benefits.

In the initial food assistance application and in each renewal that followed, Buehne asserted that a checking account was her sole economic resource. She expressly disavowed owning any land aside from her current residence, or that her name was listed as the owner of any property. Buehne signed and dated each form as certification that the information provided was complete and correct to the best of her knowledge. DCF staff interviewed Buehne following the submission of each form and she orally reaffirmed that

2

any land ownership was limited to the home she lived in. Following each interview, and in reliance on the information Buehne submitted, DCF approved an extension of Buehne's food assistance for another year.

In October 2018, DCF staff discovered that Buehne owned four rental properties in Kinsley, Kansas, that she had never reported to the agency. We will refer to these properties as A, B, C, and D, respectively, as the need arises. Parcel searches revealed that an individual with the same name as Buehne and who resided at the same address Buehne provided on her food assistance applications was the sole listed owner of each property.

DCF requested the following information from Buehne:

- Purchase dates of the properties;
- how the properties were paid for;
- proof of value of the properties;
- the amount owed on the properties;
- proof of all rent she received in 2018 from each property; and
- names and phone numbers for the tenants of those properties.

Buehne did not provide the information as directed. She opted to submit a letter instead that denied ownership of the properties and explained that she simply secured a loan that her father needed to obtain the properties. According to Buehne, he intended to renovate and use them as rental properties to generate income for Buehne. She asserted that her father had full ownership of and provided the down payments for all the properties; she merely helped him get the loan that his poor credit placed beyond his reach.

Buehne claimed that her father owed a total of at least $70,000 on the properties but failed to provide any evidence to substantiate her claim. She asserted that cleaning and providing tours for interested tenants was the full extent of her involvement with the houses. Buehne denied receiving any rent from the homes and any compensation she received merely took the form of financial assistance from her father that offset the cost of expenses related to her children.

Buehne's letter failed to include the date the properties were purchased, proof of their value and the rent received, or the names of the tenants and their contact information as specifically requested by DCF. Three days after receiving Buehne's letter, DCF closed her food assistance account because of her failure to provide the required information and notified her of the same.

A DCF fraud analyst conducted an investigation and learned that each of the properties was deeded solely to Buehne, and she took ownership of them between October 2014 and September 2015. In 2018, the county appraiser valued the properties as follows:

- Property A—$21,000
- Property B—$16,700
- Property C—$16,560
- Property D—$25,200

DCF ultimately determined that the four properties constituted excess resources that rendered Buehne ineligible for further food assistance. DCF calculated and classified the benefits Buehne received from December 2014 through January 2017 and February through October 2018 as an overpayment that totaled $13,739.

DCF referred the matter to the Kansas Office of Administrative Hearings, and an administrative disqualification hearing was subsequently conducted.

Buehne testified during the hearing and explained that she did not list the properties on her applications because she did not provide the funds to purchase them nor was she receiving any income from them. She acknowledged signing the loan documents for the properties but claimed to not understand that required her to include the properties in her application for food assistance benefits. Buehne conceded that her name was listed on the deeds but asserted that her father was properly considered their legal owner because he paid for and comprehensively maintained them. She testified that it was their collective hope the properties would provide income for her household one day.

Buehne's father also testified at the hearing and explained that the approximate value of remaining mortgage debts was $70,000, but he believed the total actual value of the four properties was closer to $60,000. He did not offer any evidence in support of those figures, nor did he attempt to assign either a particular debt or value to a specific property. Buehne's father did disclose that the properties were borderline uninhabitable at that time but he had already invested between $5,000 and $7,000 toward improving their condition. Accordingly, only two of the six living units were rented at the time of the hearing and overall, the properties had yet to yield a profit.

Following the hearing, the ALJ concluded that Buehne had a duty to report her ownership of the four properties to DCF and that the value of any one of them was significant enough to push her household beyond the $2,250 maximum allowable nonexempt resource limit. The judge also found that DCF satisfied its burden to establish, by clear and convincing evidence, that Buehne intentionally withheld information from DCF regarding her ownership interest in the properties and thereby engaged in fraudulent conduct. Because Buehne was ineligible for food assistance but nevertheless orchestrated a way to obtain it from December 2014 through January 2017 and February 2018 through

October of the same year, she essentially received $13,739 in benefits that she was not entitled to and was ordered to repay the full amount to DCF.

Buehne timely petitioned the district court for judicial review of the ALJ's order. The district court ultimately affirmed the ALJ's decision and found: (1) The ALJ did not have enough evidence for the debt on the properties to perform an equity analysis; (2) Buehne's ownership interests in the four properties disqualified her from receiving benefits; (3) Buehne committed fraud by failing to disclose her ownership interests in the properties; and (4) Buehne received overpayments of assistance in the total amount of $13,739.

Buehne now timely brings her case before this court and raises two issues for our consideration—whether the agency erred in interpreting or applying the law when calculating her resources and overpayments, and whether the agency erred in determining that the evidentiary standard for fraud was satisfied.

LEGAL ANALYSIS

I. *The agency's conclusion regarding the resource calculation is supported by substantial evidence.*

The first issue Buehne asks us to resolve is whether the agency erroneously interpreted or applied the law when calculating her household's resources and any overpayment of benefits.

The Kansas Judicial Review Act (KJRA) defines the scope of judicial review of state agency actions, unless the agency is one specifically exempted from application of its provisions. K.S.A. 77-603(a). On appeal, Buehne, as the party asserting the invalidity of the agency's action, bears the burden of proving the same. K.S.A. 77-621(a)(1); see *EagleMed v. Travelers Insurance*, 315 Kan. 411, 419, 509 P.3d 471 (2022). Appellate

6

courts exercise the same statutorily limited review of the agency's action as does the district court, as though the appeal had been made directly to the appellate court. *Bd. of Cherokee County Comm'rs v. Kansas Racing & Gaming Comm'n*, 306 Kan. 298, 318, 393 P.3d 601 (2017). Accordingly, this court must enter a separate and distinct ruling for each material issue on which the court's decision is based. K.S.A. 77-621(b).

K.S.A. 77-621(c) lists eight possible bases for granting relief upon judicial review, including the following:

> "(3) the agency has not decided an issue requiring resolution;
> "(4) the agency has erroneously interpreted or applied the law;
> . . . .
> "(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or
> "(8) the agency action is otherwise unreasonable, arbitrary or capricious."

The KJRA requires that an agency action be supported "by evidence that is substantial when viewed in light of the record as a whole." K.S.A. 77-621(c)(7); *Hanson v. Kansas Corp. Comm'n*, 313 Kan. 752, 763, 490 P.3d 1216 (2021). Substantial evidence is defined under the KJRA as "'in light of the record as a whole'" so as to include that evidence which supports as well as that which detracts from an agency's findings. K.S.A. 77-621(d). While our review of an agency's statutory interpretation is unlimited, we do not reweigh the evidence, "'including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact.'" *Hanson*, 313 Kan. at 763.

A. *Regulations require recipients to provide information that establishes their eligibility.*

State and federal law require potential recipients of public assistance to provide information that allows DCF to verify that they are eligible for the services they would like to receive. The Kansas Legislature has directed the Secretary for DCF to "develop state plans . . . whereby the state cooperates with the federal government in its program of assisting the states financially in furnishing assistance and services to eligible individuals." K.S.A. 39-708c(a). To accomplish this directive, the Legislature has also granted the secretary "the power and duty to determine the general policies relating to all forms of social welfare which are administered or supervised by the secretary and to adopt the rules and regulations therefor." K.S.A. 39-708c(b). Under the Legislature's authorization, DCF has generated a body of regulations governing the disbursement of public assistance benefits. See K.A.R. 30-4-34 et seq.

The Kansas Administrative Regulations classify food assistance—the State's arm of the federal supplemental nutrition assistance program (SNAP)—as a public assistance program. K.A.R. 30-4-34(d). Each recipient of benefits from a public assistance program bears the responsibility to provide information essential to the establishment of their eligibility and to report any change of circumstances within 10 calendar days. K.A.R. 30-4-39(a)-(b). Failure to provide the required information shall render the family group ineligible to receive assistance. K.A.R. 30-4-55(a).

Ownership of property with a resource value that exceeds the amounts prescribed by the Secretary of the United States Department of Health and Human Services under 7 U.S.C. § 2014(c) will also compromise the family group's eligibility for assistance. K.A.R. 30-4-107. In 2018, DCF determined that the maximum allowable nonexempt resource limit for Buehne's household was $2,250.

8

DCF's interpretations of applicable statutes and regulations is found in the Kansas Economic and Employment Services Manual (KEESM). *Brewer v. Schalansky*, 278 Kan. 734, 740, 102 P.3d 1145 (2004). These interpretations are not binding on our court but nonetheless hold persuasive value. The agency referenced this resource when arriving at its determination in Buehne's case.

B. *Buehne failed to provide the required information.*

Buehne contends that the agency erred when calculating her household resources. She advances three reasons in support of her claim that the ALJ erred when it found that the four undisclosed properties pushed her household over the resource limit allowed for food assistance recipients. First, she asserts that the ALJ misinterpreted the law by failing to conduct an equity analysis to determine the value of the properties. Second, she claims that the lack of an equity analysis amounted to a failure by the ALJ to decide an issue that required resolution. Third, she contends that the four properties were exempt from consideration as a resource for her household. We are not persuaded by any of these arguments as they all fall on the same sword—Buehne never provided proof of the properties' values and debts, as directed by DCF, as would allow the ALJ to perform Buehne's requested analyses. The burden to provide such information was on Buehne, and she failed to sustain that burden.

1. *The agency did not misinterpret the law by not performing an equity analysis.*

Buehne argues that the ALJ should have performed an equity analysis to determine the value of the four properties. She contends that the properties' mortgage debt was greater than their fair market value, so their equity would be negative when calculating the resources available to her household. In support of this argument, Buehne directs our attention to the testimonies she and her father offered at the hearing, which suggested they were "upside down on the property values vis-à-vis the loan amounts."

9

Under Kansas regulations, the resource value of nonexempt real property shall be that of the recipient's equity in the property. K.A.R. 30-4-106(d); K.A.R. 30-4-108(b). Equity is defined as fair market value less encumbrances. KEESM 5000. The value of a real property resource is determined by "the latest uniform statewide appraisal value of the property, which shall be adjusted to reflect current market value." K.A.R. 30-4-106(b)(1).

The district court found that an in-depth equity analysis would be impossible without the receipt of specific financial information from Buehne. Again, Buehne provided no documentary evidence for the remaining mortgage debt owed on the properties, nor any appraised market valuations on the properties. The sole evidence offered regarding the properties' encumbrances was provided through the testimony of Buehne's father when he stated that the approximate value of the remaining mortgage debt was $70,000. Likewise, he testified that the four properties were worth approximately $60,000. But again, in neither instance did he portion out those totals to establish the respective debts and values for the individual properties. When directly questioned by the ALJ, Buehne's father admitted he did not have any formal training or experience that would qualify him to give expert testimony on the properties' values and encumbrances. Meanwhile, DCF provided the ALJ with the appraisal values of the properties and, according to the Edwards County Appraiser, in 2018 they had a combined total value of $79,460. The agency's ability to conduct any further equity analysis was foreclosed by Buehne's failure to submit the necessary evidence.

### 2. *The agency did not fail to decide an issue that required resolution.*

In her next claim of error Buehne asserts that the agency's absence of an equity analysis equates with the failure to decide an issue that requires resolution as contemplated by K.S.A. 77-621(c)(3). We, like the district court below, reject this argument—as already discussed, the ALJ did not have the information required to

10

conduct an equity analysis because Buehne failed to provide any evidence that established either the value of the properties or the financial obligations related to them.

### 3. *The agency did not misinterpret the law when it considered the properties as nonexempt resources.*

Buehne's third argument consists of the claim that the agency erred by classifying the four properties as nonexempt assets. She contends they should not count against her household's maximum allowable resource limit because income producing properties are exempt from resource valuation.

Kansas regulations exempt the following properties from consideration as a resource: (1) a recipient's home, (2) other real property that is essential for employment or self-employment, and (3) other real property that is producing income consistent with its fair market value. K.A.R. 30-4-108(c). The properties at issue in this case do not meet the parameters of either the first or second exemptions. To qualify for the third exemption Buehne would have to produce documentation that established the receipt of such income and, again, none was provided. Further, Buehne repeatedly testified during the disqualification hearing that she has never received any income from any of the four properties. That testimony stands as the only evidence that bears on this issue. Accordingly, we decline to find any error in the agency's classification of the properties or its corresponding application of them towards Buehne's household resources.

Finally, Buehne challenges the agency's payment calculation. The agency could only make a determination on this issue from the information actually available to it— which is precisely what it did. It was not in the position to make mortgage obligations or documentation of rent received/tenants, etc., part of the calculation when Buehne expressly refused to provide those specifics despite the agency's directive to her to do so. The overissuance summary provided by DCF showed Buehne received $13,739 of food

assistance from December 2014 to January 2017 and from February 2018 to October 2018. Therefore, there was substantial evidence in the record to support DCF's calculation of resources and overpayments made to Buehne.

II. *There is substantial evidence to support the finding that Buehne engaged in fraudulent conduct.*

Buehne also challenges the determination that she intentionally failed to disclose the four properties and thereby committed fraud. The same standard of review applied above guides our review of this claim. That is, we must determine whether the evidence supporting the agency's factual findings is substantial when considered in light of all the evidence; meanwhile our review of an agency's statutory interpretation is unlimited. *Hanson*, 313 Kan. at 762.

A. *DCF's fraud determination was not erroneous.*

Buehne argues that reversal is appropriate under K.S.A. 77-621(c)(7) because DCF merely assumed she committed fraud without first making a determination as to whether she truly believed disclosing the properties would have harmed her chances of receiving food assistance. The provision Buehne cites to requires this court to grant relief when an agency action is based on a determination of fact "that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole."

DCF's published definition of fraud can be found in KEESM 11210:

"11210 Definition of Fraud—Fraud is defined as having intentionally:
"1.   Made a false or misleading statement, misrepresentation, concealment, or withholding of facts for the purpose of improperly establishing or maintaining eligibility; or

12

"2.   For food assistance, committing any act that constitutes a violation of the Food and Nutrition Act of 2008, the Food Assistance Program Regulations, or any Kansas statute relating to the use, presentation, transfer, acquisition, receipt, or possession of food assistance access devices (Benefits Card)."

The agency found that Buehne committed fraud under subsection (1) by intentionally withholding the fact that she had her name on, and was listed as the sole owner of, four properties at the time she applied for food assistance.

As support for her argument, Buehne asserts that the agency failed to determine whether she *intentionally* refused to disclose the properties for the express purpose of improperly establishing and maintaining eligibility. It is her position that her failure to disclose the properties was simply a product of her inability to understand what the question asked of her.

Buehne completed the 2014 annual renewal form for food assistance on November 17, 2014—less than three weeks after signing the deed for Property C on October 29, 2014. That renewal form specifically asked Buehne: "Does anyone in your household own or *have their name on* any resources? For example: cash, checking/savings/credit union accounts, certificates of deposit (CD's), stocks, bonds, IRA's, trust fund, *property* or any other resources." (Emphases added.)

We are not persuaded that the renewal form is plagued with any ambiguity in this regard. It simply inquired whether Buehne had her name listed on any property, and she did not disclose Property C despite having signed the deed for that property just weeks earlier. We are unconvinced that Buehne, a substitute teacher with some college education, did not understand that the 2014 renewal form required her to list Property C—or that the subsequent renewal forms required her to list that property along with the three others she took possession of in 2015. Presumably, Buehne was also

13

receiving insurance and tax information and any other official correspondence related to her ownership in these properties. Yet she answered this question in the negative on each form that she filled out from 2014 through 2018.

Even if we did assign some measure of merit to Buehne's claim that she failed to understand her obligation, the requirements were subsequently clarified by the agency's very specific and pointed request for additional information following its discovery of those properties. That is, once DCF became aware that Buehne owned the undisclosed properties, it specifically requested that she provide information about the properties so the agency could determine her future eligibility for food assistance. Any confusion Buehne had about what information DCF required was eliminated by this request. Buehne persisted in withholding the information DCF requested.

K.A.R. 30-4-55(a) addresses "Cooperation" and specifically states: "Each applicant, recipient, or ineligible caretaker shall cooperate with the agency in the establishment of eligibility as provided in K.A.R. 30-4-39. Failure to provide information necessary to determine eligibility shall render the family group ineligible for assistance." Thus, even if Buehne did not withhold the requested information for the purpose of improperly maintaining eligibility—the standard for fraud under subsection (1) of KEESM 11210—she still committed fraud under subsection (2). That provision states that fraud occurs when a recipient intentionally violates any of the statutes or regulations governing DCF's food assistance program. KEESM 11210(2). Buehne violated several rules and regulations that led to her disqualification from food assistance. Chief among them for purposes of this subsection was her failure to supply information essential to the establishment of eligibility and to report changes of circumstances within 10 calendar days, as required by K.A.R. 30-4-39(a)-(b).

CONCLUSION

In sum, Buehne had the burden to come forward with evidence that contradicted DCF's claims and supported her own theories, yet she repeatedly refused to do so. Viewing the record as a whole, we are satisfied there is substantial evidence to support the finding that the value of the properties put Buehne's household resources above the limit and that Buehne intentionally withheld information about the properties from DCF in violation of the food assistance program regulations, resulting in fraud.

Affirmed.